TODD BLANCHE
Acting Attorney General
BILAL A. ESSAYLI
First Assistant United States Attorney
IAN V. YANNIELLO
Assistant United States Attorney
Chief, National Security Division
LANA MORTON OWENS (Cal. Bar No. 233831)
Assistant United States Attorney
Deputy Chief, National Security Division
JENNA W. LONG (Cal. Bar. No. 332192)
Assistant United States Attorney
National Security Division
SEBASTIAN BELLM (Cal. Bar No. 359407)
Assistant United States Attorney
General Crimes Section, Criminal Division
     1500 United States Courthouse
     312 North Spring Street
     Los Angeles, California 90012
     Telephone:  (213) 894-8692/3547/0119
     Facsimile:  (213) 894-2927
     E-mail:     lana.owens@usdoj.gov
                 jenna.long@usdoj.gov
                 sebastian.bellm@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>              Plaintiff,<br><br>                   v.<br><br>ADAM CHARLES PALERMO ET AL.,<br><br>              Defendants. | No. CR 25-CR-731(A)-JFW-3<br><br>GOVERNMENT SENTENCING POSITION FOR DEFENDANT ISMAEL VEGA; DECLARATION OF LANA MORTON OWENS; EXHIBITS; RESTITUTION STATEMENT<br><br>Hearing Date: July 27, 2026<br>Hearing Time: 8:00 a.m.<br>Location:     Courtroom of the<br>              Hon. John F. Walter |

     Plaintiff United States of America, by and through its counsel of record, the United States Attorney for the Central District of California and Assistant United States Attorney Jenna W. Long, Lana Morton Owens, and Sebastian Bellm, hereby files its sentencing position for defendant Ismael Vega.

This sentencing position is based upon the attached memorandum of points and authorities, the declaration of Lana Morton Owens and Exhibits attached hereto, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: July 13, 2026                    Respectfully submitted,

                                        TODD BLANCHE
                                        Acting Attorney General
                                        BILAL A. ESSAYLI
                                        First Assistant United States Attorney

                                        IAN V. YANNIELLO
                                        Assistant United States Attorney
                                        Chief, National Security Division

                                                /s/ *Lana Morton Owens*
                                        JENNA W. LONG
                                        LANA MORTON OWENS
                                        SEBASTIAN BELLM
                                        Assistant United States Attorneys

                                        Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

<u>DESCRIPTION</u>                                                                     <u>PAGE</u>

**Contents**

TABLE OF AUTHORITIES.................................................................ii

MEMORANDUM OF POINTS AND AUTHORITIES.................................1

I.    INTRODUCTION....................................................................1

II.   DEFENDANT'S OFFENSE.........................................................1

III.  GUIDELINES CALCULATION......................................................4

IV.   GOVERNMENT'S RECOMMENDED SENTENCE.............................5

      A.    A Substantial Custodial Sentence is Appropriate in
            Light of the Nature and Circumstances of the Offense §
            3553(a)(1)................................................................5

      B.    History and Characteristics of Defendant, § 3553(a)(1)....6

      C.    Need for Deterrence, to Protect the Public, and to
            Promote Respect for the Law, § 3553(a)(2).................6

      D.    Need for the Sentence to Avoid Unwarranted
            Disparities, § 3553(a)(6)..................................7

      E.    Imposition of Supervised Release..........................8

      F.    Restitution................................................9

      G.    Fine, Forfeiture, and Special Assessments................10

V.    CONCLUSION.......................................................11

**TABLE OF AUTHORITIES**

DESCRIPTION                                                                 PAGE

<u>**CASES**</u>

<u>Gall v. United States</u>,
       552 U.S. 38 (2007)...........................................8

<u>United States v. Blinkinsop</u>,
       606 F.3d 1110 (9th Cir. 2010)................................8

<u>United States v. Saeteurn</u>,
       504 F.3d 1175 (9th Cir. 2007)................................8

<u>United States v. Treadwell</u>,
       593 F.3d 990 (9th Cir. 2010).................................7

<u>United States v. Weber</u>,
       451 F.3d 552 (9th Cir. 2006).................................8

<u>**STATUTES**</u>

18 U.S.C. § 231.....................................................1

18 U.S.C. § 232.....................................................2

18 U.S.C. § 3553....................................................5

18 U.S.C. § 3583....................................................8

<u>**OTHER AUTHORITIES**</u>

U.S.S.G. § 3E1.1....................................................4

U.S.S.G. § 4C1.1....................................................4

U.S.S.G. § 5A....................................................4, 5

U.S.S.G. § 5D1.1....................................................8

<u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

**I.    INTRODUCTION**

Defendant Ismael Vega (hereinafter, "defendant") joined a civil disorder that erupted in downtown Los Angeles on June 8, 2025. Defendant lit cardboard on fire, aimed it towards a California Highway Patrol Vehicle ("CHP"), and dropped it ono the car feet away from officers fleeing from being pelted by rocks and other objects. Defendant then thew rocks at the officer.  Defendant now awaits sentencing after pleading guilty to count seven of the superseding indictment, charging defendant obstructing, impeding, or interfering with a law enforcement officer during a civil disorder, in violation of 18 U.S.C. § 231(a)(3).

The government agrees with the United States Probation and Pretrial Services Office's ("Probation") Pretrial Services Report ("PSR") including the United States Sentencing Guidelines calculations.  Respectfully, the government recommends a within Guidelines sentence of 40 months' imprisonment; a three-year term of supervised release; that defendant be ordered to pay restitution in the amount of $253,415.24;[1] and the mandatory $100 special assessment.

**II.    DEFENDANT'S OFFENSE**

In early June 2025, federal law enforcement officials began conducting immigration enforcement operations throughout the Los Angeles, California area.  (Complaint filed in 2:25-MJ-6126-DUTY, Dkt. No. 1, also appearing at Dkt. No. 155-2, ¶¶ 4, 9.)  During those

---

[1] On or about July 8, 2026 and July 13, 2026, the parties met and conferred regarding restitution; however, the parties could not reach an agreement.  The parties remain optimistic that an agreement can be reached. <u>See</u> Section IV.F for additional details.

operations, protests occurred in and around downtown Los Angeles, California.  (Id.)  While many of the protestors peacefully exercised their First Amendment rights, some individuals directly engaged in violent actions to obstruct, impede, or interfere with law enforcement officers.  (Id. ¶¶ 4, 9-11.)  Many of those actions occurred during a civil disorder as defined by 18 U.S.C. § 232(1), and obstructed, delayed, and adversely obstructed commerce, the movement of articles and commodities in commerce on June 8, 2025, in the vicinity of the United States Highway 101 Main Street overpass. (Id. ¶ 12; Dkt. No. 276, Presentence Investigation Report filed June 18, 2026 (hereinafter "PSR") ¶¶ 22-31.)  During the civil unrest on June 8, 2025, multiple CHP vehicles were damaged by rocks, debris, thrown scooters, and lit on fire, while CHP officers had to remain under the overpass for safety.  (Id.)  The photograph below depicts this civil disorder.



(Dkt. 155-2 ¶ 12.)

Defendant was amongst the group engaging in this civil disorder, including around 7:30 p.m. to 8:00 p.m., when some of the worst civil

2

disorder occurred.  (PSR ¶ 27.)  At this time, one CHP vehicle, near the overpass and near the officers who were under the overpass for safety from objects being thrown from above, was already on fire. (PSR ¶¶ 25-26.)  Defendant knew the vehicle was on fire and lit a large piece of cardboard on fire, held it over the railing to line it up to land on a CHP vehicle, and dropped it.  (PSR ¶ 28.)  Defendant also – multiple times – attempted to assist other individuals in lighting debris on fire to drop on the CHP vehicles.  (Id.)  Over the course of the civil disorder, defendant also threw multiple rocks at law enforcement officers.  (PSR ¶ 30.)

Later, defendant ignited a piece of debris and threw it on or directly in front of the previously burning CHP patrol car directly in front of him. Within seconds of Vega throwing the burning debris, the smoke from the CHP patrol car started to rise again.  (PSR ¶ 31.)

This civil disorder stood apart in its magnitude.  A sergeant in the California Highway Patrol with nearly three-decades in law enforcement wrote a statement about how this incident stood apart and the impact it had on him and his son, attached as **Exhibit A.** (Declaration of Lana Morton Owens ("Owens Decl.") ¶ 2; PSR ¶¶ 34-36.) His experience underscores how violent this incident became and the deep toll it took on all law enforcement present.

On April 29, 2026, defendant entered a plea of guilty to count seven of the superseding indictment pursuant to a plea agreement. (Dkt. Nos. 237, 249.)

Defendant is a 41-year-old Los Angeles resident.  (PSR ¶ 80, 79.)  Defendant has three prior convictions, one for trespassing, one for vehicle theft, and one possession of a controlled substance, each more than 20 years old.  (PSR ¶¶ 69-71.)  Defendant is also currently

facing two open criminal cases; one related to the instant offense and one for petty theft.  (PSR ¶ 75.)  Notwithstanding these convictions and open cases, defendant has no criminal history points.

**III. GUIDELINES CALCULATION**

The parties and Probation agree, defendant's base offense level is 24 under U.S.S.G. § 2K1.4(a)(1)(A),[2] as a substantial risk of death or serious bodily injury was created knowingly, which is plain by the danger of a vehicle on fire.  (Dkt. No. 237 ¶ 12; PSR ¶¶ 43-48.)  Defendant is entitled to a three-level reduction in offense level because of his timely acceptance of responsibility.  (PSR ¶¶ 61-62.)  U.S.S.G. § 3E1.1(a), (b).

Defendant is in criminal history category I with zero criminal history points.  (PSR ¶¶ 67-78.)  U.S.S.G. § 5A.  Despite defendant's lack of criminal history points, defendant is ineligible for the zero-point offender reduction under U.S.S.G. § 4C1.1 because defendant used violence[3] in connection with the offense and he possessed a dangerous weapon.  (PSR ¶ 63-64.)  U.S.S.G. § 4C1.1(3), (7), respectively.

In sum, the total offense level is 21, which, with a criminal history category of I, yields a Guidelines range of 37 to 46 months'

[2] Pursuant to U.S.S.G. § 2X5.1(a), when no guideline expressly applies to a statute the one most analogous should apply.  Here, Probation and the parties agree that would be arson under U.S.S.G. § 2K1.4.

[3] "Used violence" is not defined by the Guideline or its application notes.  "Crime of violence" as defined by U.S.S.G. § 4B1.2(a) includes any crime including the "use, attempted use, or threatened use of physical force against the person of another" or unlawful possession of a firearm described in 26 U.S.C. § 5845(a). Here, defendant lit a piece of cardboard on fire and threw that destructive device towards CHP officers, admitting that the objects he was throwing and the burning debris he was dropping "created a substantial risk of death or serious bodily injury to the officers." (See Plea Agreement ¶ 10).

4

imprisonment.  U.S.S.G. § 5A.  While USPO recommends a sentence of 37 months, the government submits that a sentence of 40 months, the identical recommendation the government made for co-defendant Flores, is the appropriate sentence in light of the totality of the circumstances.

**IV.   GOVERNMENT'S RECOMMENDED SENTENCE**

The government recommends that the Court sentence defendant to a within Guidelines sentence: 40 months' imprisonment; a three-year term of supervised release; no fine; $253,415.24 restitution; and the mandatory $100 special assessment.  This sentence is appropriate, reasonable, and not greater than necessary to account for the factors the Court must consider under 18 U.S.C. § 3553(a).

> **A.    A Substantial Custodial Sentence is Appropriate in Light of the Nature and Circumstances of the Offense § 3553(a)(1)**

As an initial matter, a substantial custodial sentence -- which the government's recommended sentence reflects -- is necessary to reflect the gravity of defendant's crimes and the danger he inflicted.  This is underscored by the victim impact statement.  (See Ex. A.)  A lower, or below-Guidelines sentence fails to consider the seriousness of defendant's offenses.  Arson is plainly a serious offense, specifically, defendant lit debris on fire and threw it onto a CHP vehicle.  Defendant aimed the burning cardboard, over the very large engine and mechanical parts below the hood that if damaged sufficiently may not just ignite but explode.  The vehicle defendant and others targeted was also the closest to the overpass, which is where defendant knew several CHP officers were taking cover from the objects that the crowd would throw every time an officer came out.  This also inhibited the officers' efforts to extinguish the flames.

Defendant enhanced an already dangerous situation, and the fact that no one killed is pure luck, and not because defendant or any others showed restraint.

**B.    History and Characteristics of Defendant, § 3553(a)(1)**

The instant conviction will be defendant's first felony conviction in over 20 years.  As a result, defendant falls into criminal history category I with no criminal history points.  This places defendant in the same category as defendants who have never been arrested.  The Court should not ignore defendant's prior convictions, arrests, and current pending charges.  (PSR ¶¶ 72-78.)

Defendant's personal characteristics are complicated by mental health and prior substance abuse issues.  While the government is sympathetic to defendant's struggles, that sympathy does not justify a below-Guidelines sentence.  Rather, it justifies the government's recommended sentence that correctly accounts for the serious nature of defendant's offenses.  It is because of these challenges, in mitigation, that the government is not seeking a higher sentence and resolved the matter in a way that allowed for a more lenient sentence.  Further, defendant's compliance while on pre-trial release has been troubling.  As indicated by a July 10, 2026 "PSA Letter" defendant has refused treatment for his mental health.  (Dkt. 326.) A sentence of 40 months correctly balances defendant's history and characteristics with the nature and circumstances of the offense.

**C.    Need for Deterrence, to Protect the Public, and to Promote Respect for the Law, § 3553(a)(2)**

Any sentence below Guidelines, will not promote respect for the law nor deter defendant or others from engaging in the same exceedingly dangerous behavior.  On June 8, 2025, defendant could

6

have peacefully protested, as many did; but instead, defendant intentionally lit debris on fire and dropped it onto a CHP vehicle feet away from law enforcement officers.  Defendant then threw rocks and encouraged others to engage in similar conduct.  Defendant's conduct warrants a sentence that will deter defendant specifically, and -- importantly -- others generally, from resorting to violent acts and endangering others in times of civil disorder.

A substantial sentence would also promote respect for the law.  The law draws a line that prohibits violent, dangerous conduct like defendant's is necessary to protect the fundamental rights of everyone in the community and those that choose to demonstrate and protest lawfully.  A substantial custodial sentence would send the message that when someone crosses the line into unlawful and violent civil disorder, especially when that conduct endangers members of the community, it will be met with significant consequences.

**D.    Need for the Sentence to Avoid Unwarranted Disparities, § 3553(a)(6)**

Section 3553(a)(6) requires the Court to minimize sentencing disparities among similarly situated defendants.  One way of doing so is to correctly calculate the Guidelines range.  See United States v. Treadwell, 593 F.3d 990, 1011 (9th Cir. 2010) ("Because the Guidelines range was correctly calculated, the district court was entitled to rely on the Guidelines range in determining that there was no 'unwarranted disparity' . . . ."); Gall v. United States, 552 U.S. 38, 54 (2007) ("[A]voidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges.").  The best way to ensure consistent sentences for similarly-situated defendants across courtrooms, districts, and

7

the country is to apply the sentencing guidelines uniformly.  United States v. Saeteurn, 504 F.3d 1175, 1181 (9th Cir. 2007).  Here, under correctly calculated Guidelines range, which the parties agree apply, other defendants "with similar records who have been found guilty of similar conduct" as defendant can expect a sentence between 37 to 46 months' imprisonment.  A sentence of 40 months is appropriate in this case and avoids unwarranted sentencing disparity.

### E.   Imposition of Supervised Release

District courts have wide latitude in imposing conditions of supervised release.  United States v. Blinkinsop, 606 F.3d 1110, 1118 (9th Cir. 2010); United States v. Weber, 451 F.3d 552, 557 (9th Cir. 2006).  A sentencing court even has broad discretion to impose conditions of supervised release not named by statute.  18 U.S.C. § 3583(d) (district court may impose "any condition set forth as a discretionary condition of probation in section 3563(b) and any other condition it considers to be appropriate").  Of particular note, in cases where a defendant "is an abuser of controlled substances or alcohol, it is highly recommended that a term of supervised release be imposed."  See U.S.S.G. § 5D1.1, cmt. n.3.

The imposition of the maximum three-year term of supervised release is crucial to incentivizing defendant to refrain from returning to criminal conduct, especially given the gravity of the conduct involved, and work to address defendant's mental health and substance abuse issues.  This Court's close supervision will be necessary to hold him accountable for his actions and to effectively protect the public from any future crimes of defendant.  Given defendant's history with substance abuse, mental health issues, and

lack of compliance on pretrial release, the government submits that substance abuse and mental health conditions are necessary.

### F.    Restitution

Under § 3663A, the Court must order full restitution without regard to defendant's economic situation.  18 U.S.C.§ 3664(f)(1)(A). The Court shall order full and immediate payment of restitution, unless, in the interest of justice, the Court provides for payment on a date certain or in installments.  18 U.S.C. § 3572(d)(1). "Immediate payment of restitution is the general rule."  See United States v. Martin, 278 F.3d 988, 1006 (9th Cir. 2002) (finding that the district court did not err in following the general rule because it had information regarding the defendant's financial resources that it had "presumably considered and found insufficient to warrant periodic payments"); see generally United States v. Ross, 310 Fed. Appx. 160, 162 (9th Cir. 2009) (finding that "immediate repayment is the rule" but that "[e]xceptions may be made in the interests of justice, such as when the defendant is not able to make more than nominal periodic payments," and the defendant carries the burden of proving such inability).

Here, three vehicles, as shown in the picture above, were exposed and targeted by the individuals on the overpass, including defendant and his co-defendant's, with fire, rocks, scooters, street signs, and other objects.  They sustained such a large level of damage they were considered a total loss.  In sum, according to the CHP, the total damage sustained across these three vehicles is $253,415.24.  (Owens Decl. ¶ 3; Exhibit B.)  As such, defendant should be ordered to pay restitution in that amount, jointly and severally liable with any other co-defendants the Court orders to pay

restation.[4] Defendant should be held jointly liable for the restitution, and any order should ensure that CHP may only recover the ordered amount.

### G.    Fine, Forfeiture, and Special Assessments

The government agrees with Probation that defendant is unable to pay a fine, and therefore that no fine should be imposed.  Defendant must pay a mandatory $100 special assessment for each count of conviction.  (PSR ¶ 124.)  The indictment did not include criminal forfeiture allegations, and the government is not pursuing criminal forfeiture.

---

[4] The victim should not receive compensation in excess of the total restitution amount ordered by the Court regardless of the source.  Any amounts paid by one defendant should accordingly be credited against the restitution obligation of all jointly liable defendants, and the Clerk of the Court and the United States can ensure that the victim's aggregate recovery does not exceed the total amount of restitution ordered.

10

## V.   CONCLUSION

For the foregoing reasons, the Court should impose a within Guidelines sentence: 40 months' imprisonment; three years' supervised release; no fine; restitution in the amount of $253,415.24; and a $100 special assessment.  The government submits that this sentence is "sufficient, but not greater than necessary, to comply with the purposes enumerated in 18 U.S.C. § 3553(a)(2)."  18 U.S.C. § 3553(a).

Dated: July 13, 2026                    Respectfully submitted,

                                        TODD BLANCHE
                                        Acting Attorney General

                                        BILAL A. ESSAYLI
                                        First Assistant United States
                                        Attorney

                                        IAN V. YANNIELLO
                                        Assistant United States Attorney
                                        Chief, National Security Division


                                        _____/s/ *Lana Morton Owens*_____
                                        JENNA W. LONG
                                        LANA MORTON OWENS
                                        SEBASTIAN BELLM
                                        Assistant United States Attorneys

                                        Attorneys for Plaintiff
                                        UNITED STATES OF AMERICA

11

**DECLARATION OF LANA MORTON OWENS**

I, Lana Morton Owens, declare as follows:

1.    I am an Assistant United States Attorney ("AUSA") in the Central District of California and am assigned to represent the government in United States v. Palermo et al., CR No. CR-731(A)-JFW-3.

2.    Attached as **Exhibit A** is a true and correct copy of a victim impact statement written and submitted by California Highway Patrol Sergeant P.R. who was present during the charged offense on June 8, 2025.

3.    I have reviewed materials provided by the California Highway Patrol regarding damage to their property -- vehicles – during the charged offense.  According to California Highway Patrol, the three vehicles damaged were totaled and the cost of the damage sustained was $80,972.64, $86,221.30, and $86,221.30.   The total loss amount is $253,415.24.  Attached hereto as **Exhibit B** is the damage summary report, the highlighted vehicles are the vehicles pictured in this submission.

4.    On or about June 17, 2026, the government provided the defense with restitution calculations provided by CHP. On or about July 9, 2026, the government conferred with defense counsel.  While counsel indicated that he understood the government's position regarding restitution, he was not in a position to agree with the government's position or provide any alternative restitution amount.

///

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration is executed at Los Angeles, California, on July 13, 2026.

LANA MORTON OWENS
Assistant United States Attorney
National Security Division

2

## Exhibit A

Victim: P███ R███
USAO Number: ████████
Court Docket Number: 25-CR-00731

My name is Sgt P███ R███ and I am currently employed by the California Highway Patrol in the Riverside Area. In June 2025, I was deployed to Los Angeles to assist as a member of the Special Response Team (SRT). My response was due to civil unrest in the city. Thousands of protestors made their way illegally onto the 101 freeway and I was part of a group of law enforcement involved in moving the crowd off the freeway. Once off the freeway, law enforcement found themselves at a position of disadvantage on the 101 freeway, which was below surrounding streets that were elevated above the freeway and occupied by thousands of violent protestors. Throughout the evening, the violence escalated and law enforcement below were being attacked by rocks, bottles, commercial fireworks, Molotov cocktails, and various other projectiles. I was involved in a mission to try and rescue and secure several vulnerable vehicles and law enforcement personnel to get them to a safer location. While traveling on the 101 freeway, bounding in a black and white patrol vehicle, from overcrossing to overcrossing, a large piece of concrete struck my windshield directly in front of my face. At the time, I believed my car had been struck by a random object that happened to strike the patrol car. Glass shattered all over my face and body and thankfully did not continue through the windshield. I eventually was able to move personnel and some vehicles to a safer location. I later saw footage of my incident and learned through the video that my vehicle was targeted by a suspect that noticeably targeted my car with intent to seriously injure or kill the occupants of the vehicle. This instantly changed my thought of the situation. I could had died. I could have been killed. This was an intentional and targeted attempt to kill the law enforcement personnel in that vehicle; my vehicle, and me specifically. This reality had a mental impact on me for several days. I have been in law enforcement for over 26 years, and this was one of the most violent experiences I have been involved in. Throughout the evening after this incident, while still dealing with violent protestors, I pulled countless shards of glass from my skull and face. Several were deep enough to draw blood. Upon arriving at home that night after midnight, I woke up my son (14), and had him use tweezers to pull large shards of glass out of by back and areas of my body I could not reach, while explaining to him what had happened. The mental toll it took on my son was tough to watch as well. I spent the next two weeks responding to Los Angeles every day to keep the peace and restore order to the city. In 26 years of law enforcement experience, this deployment exposed me to more pure hatred, blind aggression, and indiscriminate disrespect towards law enforcement than I had previously experienced. The acts I witnessed and was victim to were targeted, cowardly, and full of hatred and malice. The effects of such actions have taken a toll on me personally, both mentally and physically. They have also negatively affected countless other law enforcement professionals, as well as other members of society across the country in ways that cannot really be measured. It is my opinion the cowards that made the decision to commit these violent acts against the city of Los Angeles and the law enforcement there to protect the city should receive the harshest punishments allowed by the law for the crimes they chose to commit. Actions have consequences and they should face the consequences for the actions they chose while they thought they were safe, cowardly hiding in the crowds they were inciting into violence. Thank you for your time and dedication to upholding the laws of this great country. God Bless.   Sgt P██ R███

# EXHIBIT B

| ICE Enforcement Related Riots, Los Angeles, June 2025 | | | | | |
|---|---|---|---|---|---|
| **Southern Division Vehicles** | | | | | |
| Model Year | Model | Date of Damage | Type of Damage | Estimate $ | Total Loss | (If so,) Total Loss Replacement Cost |
| 2013 | Explorer | 6/8/2025 | RF Fender, RH doors | $5,152.32 | | |
| 2020 | Charger | 6/8/2025 | | No Estimates | | |
| 2021 | Explorer | 6/8/2025 | R/R door damage | $675.03, $777.85, $674.95 | | |
| 2021 | Explorer | 6/8/2025 | Windshield | $682.90 | | |
| 2021 | Explorer | 6/8/2025 | | $855.78 | | |
| 2021 | Explorer | 6/8/2025 | | No Estimates | | |
| 2021 | Explorer | 6/8/2025 | | No Estimates | | |
| 2021 | Explorer | 6/8/2025 | Rocks- All over | Surveyed ($35,150.01) | Yes | $ 80,972.64 |
| 2021 | Explorer | 6/8/2025 | Rocks- Hood, Windshield, Roof | No Estimates | | |
| 2023 | Charger | 6/8/2025 | Rocks- Hood Scratches | Body $729.40, $831.25, $901.78, W/S $405.80 | | |
| 2023 | Charger | 6/8/2025 | Push Bumper, header panel, headlight | $4,671.47 | | |
| 2023 | Charger | 6/8/2025 | Rocks- Windshield, R/R Quarterpanel? | Body: $4,895.14, W/S: $553.50 | | |
| 2023 | Charger | 6/8/2025 | Kicks to RH side | $1735.35, $2575.85, $2265.81 | | |
| 2023 | Charger | 6/8/2025 | To be surveyed? | $22,838.94, $23,535.96 | TBD | $ 98,282.52 |
| 2019 | Charger | 6/8/2025 | | $10,961.4, $16,676.44, $11,269.52 | | |
| 2019 | Charger | 6/8/2025 | Air bags deployed, no body damage (allegedly) | $5,217.00 | | |
| 2016 | Tahoe 4WD | 6/8/2025 | | No Estimates | | |
| 2020 | Tahoe 4WD | 6/8/2025 | L/R glass, Front grill | Body: $ Glass: $575.00 | | |
| 2020 | Tahoe 2WD | 6/8/2025 | | No Estimates | | |
| 2020 | Tahoe 2WD | 6/8/2025 | Rocks/Fire- Surveyed | Surveyed | Yes | $ 86,221.30 |
| 2020 | Tahoe 2WD | 6/8/2025 | | No Estimates | | |
| 2020 | Tahoe 2WD | 6/8/2025 | Rocks- All panels, shattered windshield, Paint Splatter | Surveyed ($16,014.07, $15,422.50, $20,836.67) | Yes | $ 86,221.30 |
| 2020 | Tahoe 2WD | 6/8/2025 | Rocks- Every Panel | Surveyed ($6,877.63, $10,288.95, $11,017.10) | Yes | $ 86,221.30 |
| 2020 | Tahoe 2WD | 6/8/2025 | | No Estimates | | |
| 2020 | Tahoe 4WD | 6/8/2025 | RH doors, liftgate | $8,355.96, $8,656.00, $10,060.85 | | |

**$437,919.06**

**Total Loss Vehicle Costs**
**$437,919.06**