John Targowski (Bar No. 226053)
Targowski Law Office
475 Washington Boulevard, Suite 940
Marina Del Rey, CA 90292
Telephone: (310) 920-9177
Email: jtargo@icloud.com

Attorney for Defendant
**ISMAEL VEGA**

# UNITED STATES DISTRICT COURT

## FOR THE CENTRAL DISTRICT OF CALIFORNIA

### WESTERN DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | Case No. 2:25-cr-00731-JFW-2 |
| Plaintiff, | The Honorable John F. Walter |
| v. | **DEFENDANT ISMAEL VEGA'S SENTENCING MEMORANDUM** |
| **PALERMO, et al.,** | Sentence Date:  July 27, 2026 |
| | Sentence Time:  8:00 A.M. |
| **ISMAEL VEGA #2,** | |
| Defendant. | |

Defendant Ismael Vega ("Mr. Vega"), through counsel John Targowski, hereby files his Defense Sentencing Memorandum.

DATED: July 13th, 2026         Respectfully Submitted,

/s/

JOHN TARGOWSKI
Attorney for Defendant
ISMAEL VEGA

1

# TABLE OF CONTENTS

**I. INTRODUCTION** ...................................................................................................................4

**II. PROCEDURAL HISTORY** ...............................................................................................5

**III. THE PSIR (ECF 296)** .......................................................................................................6

    a. The Stipulated Guideline Calculation ..........................................................................6

    b. Legal Dispute — The Zero-Point Offender Reduction (§ 4C1.1) .........................6

    c. Factual Corrections .........................................................................................................8

**IV. THE DISCLOSED SENTENCE RECOMMENDATION LETTER (ECF 295)** .............9

**V. THE § 3553(a) FACTORS** ...............................................................................................10

    a. The Nature and Circumstances of the Offense — Context Without Excuse .......................10

    b. Mr. Vega's History and Characteristics — Compounded Grief and Serious, Untreated Mental Illness..................................................................................................11

    c. Mr. Vega's Chemically Dependent Adulthood.................................................12

    d. The Supervision Relapse, Addressed Candidly ...........................................12

    e. Mr. Vega's Sincere Remorse and Acceptance of Responsibility .........................13

    f. Mr. Vega's Family and Community Support ......................................................14

    g. Mr. Vega's Minimal and Remote Criminal History (§ 3553(a)(1), (a)(6)) .........................14

    h. Future Plans, Rehabilitation, and Treatment Needs (§ 3553(a)(2)(D)) .............................14

    i. The Need to Avoid Unwarranted Disparities (§ 3553(a)(6))................................15

**VI. CONCLUSION** .................................................................................................................17

# TABLE OF AUTHORITIES

**Cases**

Gall v. United States, 552 U.S. 38 (2007) ................................................................8

United States v. Mattis, No. 1:20-cr-00203-BMC (E.D.N.Y. 2022–2023) ...................................16

United States v. Munoz-Nava, 524 F.3d 1137 (10th Cir. 2008)......................................................12

United States v. Tomko, 562 F.3d 558 (3d Cir. 2009) (en banc)....................................................12

**Statutes**

18 U.S.C. § 231(a)(3)................................................................................................4

18 U.S.C. § 3553(a) ................................................................................................5

18 U.S.C. § 3621(e) ................................................................................................15

26 U.S.C. § 5845(a) ................................................................................................8

**United States Sentencing Guidelines**

U.S.S.G. § 2K1.4 ................................................................................................4

U.S.S.G. § 2X5.1 ................................................................................................6

U.S.S.G. § 3E1.1................................................................................................6

U.S.S.G. § 4B1.2................................................................................................7

U.S.S.G. § 4C1.1................................................................................................6

**Other Authorities**

Felitti, V.J., et al., Relationship of Childhood Abuse and Household Dysfunction to Many of the Leading Causes of Death in Adults: The Adverse Childhood Experiences (ACE) Study, 14 Am. J. Preventive Med. 245 (1998)................................................................................................11

DEFENDANT ISMAEL VEGA'S SENTENCING MEMORANDUM

## I.      **INTRODUCTION**

Mr. Vega is a forty-one-year-old lifelong resident of Los Angeles who stands before this Court for sentencing following his guilty plea to a single count of obstructing, impeding, or interfering with law enforcement during a civil disorder, in violation of 18 U.S.C. §§ 231(a)(3), 2(a). The conduct arose from the events of June 8th, 2025 on the Main Street overpass of the 101 Freeway in downtown Los Angeles. Mr. Vega accepts full responsibility for his conduct and for the harm it caused, and he has agreed to make restitution to the California Highway Patrol[1].

This was not the conduct of a hardened or sophisticated criminal. Mr. Vega falls in Criminal History Category I, with no criminal history points and no conviction of any kind in nearly twenty years. His advisory range is driven almost entirely by a stipulated analogy to the arson guideline, U.S.S.G. § 2K1.4, rather than by any planning, leadership, or financial motive. As his own words to the Probation Officer reflect, he "*made a wrong decision*" on a night of mass civil unrest that he experienced through the lens of profound and wholly untreated psychological distress—grief over the deaths of both of his parents and his disabled sister, diagnosed post-traumatic stress disorder, anxiety, and depression for which he has never once received treatment, and a decades-long substance use disorder that began after a catastrophic injury and that continues unremitted to this day.

Consistent with the parties' Plea Agreement, the defense respectfully requests that the Court impose a sentence of **18 months' imprisonment**—a downward variance from the advisory Guidelines range of 37 to 46 months—together with a judicial recommendation that Mr. Vega be designated to a facility in the Southern California region and that he be evaluated for participation in the Residential Drug Abuse Program ("RDAP") and provided the mental-health

---

[1] Mr. Vega and the government met and conferred with regard to restitution and could not come up with an agreement at the time of filing for amount owed.

DEFENDANT ISMAEL VEGA'S SENTENCING MEMORANDUM

treatment he has needed for years. Such a sentence is sufficient, but not greater than necessary, to satisfy the purposes of sentencing under 18 U.S.C. § 3553(a).

## II.      PROCEDURAL HISTORY

The offense conduct occurred on June 8th, 2025, during a civil disorder near the 101 Freeway in downtown Los Angeles. Mr. Vega was arrested on October 29th, 2025 and made his initial appearance that day before the Honorable Magistrate Judge Jacqueline Chooljian, who appointed the undersigned and ordered Mr. Vega released on a $5,000 appearance bond with an affidavit of surety (posted by his now wife, Carmen Gonzalez) and pretrial supervision. Mr. Vega has remained out of custody and has appeared as required throughout these proceedings.

Mr. Vega was named in Counts 3, 4, and 7 of a seven-count First Superseding Indictment that charged nine defendants. He entered a not-guilty plea at his post-indictment arraignment on November 18th, 2025, and the case was assigned to this Court.

On April 27th, 2026, the parties' written Plea Agreement was filed (ECF 237). On April 29th, 2026, Mr. Vega appeared before this Court and changed his plea from not guilty to guilty as to Count 7, charging a violation of 18 U.S.C. §§ 231(a)(3), 2(a) (ECF 249). Pursuant to the agreement, the Government will move at sentencing to dismiss Counts 3 and 4 and to recommend a three-level reduction for acceptance of responsibility. The parties stipulated to a base offense level of 24 under U.S.S.G. § 2K1.4(a)(1)(A), while reserving the right to argue for a sentence outside the resulting range based on the factors set forth in 18 U.S.C. § 3553(a).

On June 4th, 2026, on the parties' joint recommendation, the Court modified Mr. Vega's conditions of pretrial release to require that he participate in residential substance-abuse treatment and mental-health treatment as directed by the supervising agency. On June 18th, 2026, USPO Amber Dodson disclosed the Presentence Investigation Report (ECF 296) and the disclosed recommendation letter (ECF 295). The PSIR calculates a total offense level of 21 and a

Criminal History Category of I, yielding an advisory Guidelines range of 37 to 46 months. On July 10th, 2026 a PSA letter (ECF 326) was disclosed to the Court concerning Mr. Vega's difficulties adjusting to pre-trial supervision and requesting a show cause hearing for his sentence hearing date. On July 13th, 2026 the government filed its sentencing position asking the Court to impose a 40-month sentence (ECF 332). Mr. Vega is scheduled to be sentenced by this Court on July 27th, 2026.

### III. THE PSIR (ECF 296)

#### a. The Stipulated Guideline Calculation

Mr. Vega does not contest the stipulated base offense level. Because no Guideline expressly governs a violation of 18 U.S.C. § 231(a)(3), the Probation Officer applied the most analogous Guideline under U.S.S.G. § 2X5.1 and determined that § 2K1.4 (arson and property damage by fire) best fit the conduct, producing a base offense level of 24 under § 2K1.4(a)(1)(A). (PSIR ¶¶ 43–48.) After a three-level reduction for acceptance of responsibility under § 3E1.1, the total offense level is 21. (PSIR ¶¶ 61–65.) Mr. Vega has zero criminal history points, placing him in Criminal History Category I. (PSIR ¶¶ 72–73.) The resulting advisory range is 37 to 46 months. The defense accepts this calculation, subject to the discrete legal dispute below.

#### b. Legal Dispute — The Zero-Point Offender Reduction (§ 4C1.1)

Mr. Vega respectfully submits that he qualifies for the two-level "zero-point offender" reduction under U.S.S.G. § 4C1.1. He plainly satisfies ten of the eleven enumerated criteria: he received no criminal history points, was not assessed any terrorism, hate-crime, vulnerable-victim, or aggravating-role adjustment, did not possess a firearm, was not engaged in a continuing criminal enterprise, and his offense was neither a sex offense nor an offense under § 2H1.1, and did not result in death or serious bodily injury. (See PSIR ¶ 63.)

The Probation Officer withheld the reduction on a single, narrow ground: the view that the offense "involved violence" within the meaning of § 4C1.1(a)(3). (PSIR ¶ 64.) That ground cannot bear the weight placed on it, because the operative word—"violence"—is left undefined, and the Government itself has now conceded as much. In its sentencing position for Mr. Vega's co-defendant, the Government acknowledged in writing that "[u]sed violence is not defined by the Guideline or its application notes," and it was forced to reach outside § 4C1.1 to borrow the "crime of violence" definition from § 4B1.2(a). (Gov't Sentencing Position re Flores, ECF 304, at 4 n.3.) When the very party resisting the reduction must import a definition the Sentencing Commission chose not to supply, the term is ambiguous on its face—and that ambiguity should not be resolved against Mr. Vega.

Taking the government on its own chosen terms only sharpens the point. Section 4B1.2(a) defines a "crime of violence" as one involving "the use, attempted use, or threatened use of physical force against the person of another." The gravamen of that definition is force against a person. Yet the conduct on which the Probation Officer principally relied was Mr. Vega's aiming of burning cardboard at a CHP vehicle (PSIR ¶ 28)—conduct directed at property, and the very same conduct that already drives his offense level upward through the arson analogy of § 2K1.4. To withhold the zero-point reduction on the basis of that same property-directed conduct effectively counts it twice. It is also undisputed that the offense did not result in death or serious bodily injury, satisfying § 4C1.1(a)(4): no officer was struck, and no one was injured.

The defense does not ignore the PSIR's separate statement that Mr. Vega threw rocks toward officers. (PSIR ¶ 30.) But whether throwing an object toward officers who were under cover—with no allegation that any rock struck or injured anyone—amounts to "violence" under

DEFENDANT ISMAEL VEGA'S SENTENCING MEMORANDUM

an admittedly undefined term is exactly the kind of close, unsettled question that the government's own concession shows cannot be resolved against Mr. Vega as a matter of course. Two further points confirm it. First, the Government has since pivoted, arguing in its own sentencing position that Mr. Vega also "possessed a dangerous weapon" under § 4C1.1(a)(7) because he lit "a piece of cardboard on fire and threw that destructive device towards CHP officers." (ECF 332 at 4 & n.3.) But a piece of cardboard grabbed from the ground is not a "destructive device" within the meaning of 26 U.S.C. § 5845(a), which reaches bombs, grenades, rockets, mines, and comparable manufactured explosive or incendiary weapons—the very category the Government properly invoked against co-defendant Flores, who came prepared with and poured out bottles of accelerant. (Compare ECF 304 at 4–5 & n.3.) That the Government must equate burning cardboard with a military-grade destructive device only shows how far it must reach to defeat a reduction Mr. Vega otherwise plainly earns. Second, the offense of conviction, 18 U.S.C. § 231(a)(3), is not itself a categorical crime of violence: it punishes obstructing, impeding, or interfering with officers during a civil disorder, and may be committed without any use of force against a person at all. Should the Court agree and apply the reduction, Mr. Vega's total offense level would fall to 19 and his advisory range to 30 to 37 months.

In all events, the requested 18-month sentence falls below either range, and the § 3553(a) analysis set out below independently supports it. The Guidelines are "the starting point and the initial benchmark" only; this Court's overarching obligation is to impose a sentence that is sufficient but not greater than necessary. *Gall v. United States*, 552 U.S. 38, 49–50 (2007).

**A.   c.   Factual Corrections**

Subject to confirmation with Mr. Vega, the undersigned notes one apparent clerical matter: paragraph 38 of the PSIR recites that the presentence interview occurred on "June 8,

2025"—the date of the offense—which appears to be a typographical error, as the interview occurred on June 8th, 2026.

**IV.    THE DISCLOSED SENTENCE RECOMMENDATION LETTER (ECF 295)**

USPO Dodson recommends a low-end Guidelines sentence of 37 months' imprisonment, followed by a three-year term of supervised release with conditions including drug testing, outpatient and residential substance-abuse treatment, and mental-health treatment. The Probation Officer further recommends that the Bureau of Prisons conduct a mental-health evaluation and provide all necessary treatment, and that Mr. Vega be considered for RDAP. No fine is recommended in light of Mr. Vega's documented inability to pay, and the parties have not come to an agreement regarding financial restitution.

The defense respectfully disagrees with the recommended length of incarceration. The Probation Officer identified "no factors that would warrant a recommendation for a variance." (PSIR ¶ 130.) That assessment does not adequately weigh the severity of Mr. Vega's untreated mental illness, the compounded grief that underlies his diagnosed PTSD, the complete absence of any meaningful criminal history for two decades, or the central role that untreated addiction has played in his life and his challenging time on pre-trial supervision. Notably, the very treatment the Probation Officer recommends—RDAP and mental-health care—reflects the recognition, under § 3553(a)(2)(D), that Mr. Vega's needs are treatment needs. Those needs are best served by a meaningful but shorter custodial term coupled with the intensive programming the defense requests, rather than by additional years of incarceration that would do little but delay the treatment he has never received.

DEFENDANT ISMAEL VEGA'S SENTENCING MEMORANDUM

## V.    THE § 3553(A) FACTORS

### a.    The Nature and Circumstances of the Offense — Context Without Excuse

Mr. Vega does not minimize the seriousness of what occurred. On the evening of June 8th, 2025, amid a large and volatile civil disorder on and around the 101 Freeway overpass, he lit a piece of cardboard and debris on fire and dropped it toward a California Highway Patrol vehicle, threw rocks toward officers, and encouraged others nearby. (PSIR ¶¶ 27–31.) The defense acknowledges the victim-impact statement of CHP Officer P.R., a twenty-six-year veteran who described being struck by shattering glass and the toll the night took on him and his family. (PSIR ¶¶ 35–36.) The undersigned does not ask this Court to overlook that harm; Mr. Vega has accepted responsibility for his part in it and has agreed to make restitution.

Section 3553(a)(1) nonetheless requires an individualized assessment of the circumstances in which this particular man acted. This was not planned, organized, or financially motivated conduct. It was a spontaneous act amid a mass event—conduct the Probation Officer characterized as neither aggravating nor mitigating in role, of "medium" culpability among the participants. (PSIR ¶¶ 56–57.) Mr. Vega's own explanation is revealing, and it is offered to explain rather than to justify: "*I was traumatized by all the stuff I saw on the news about ICE. It was emotional for me. I was having a lot of emotions and I didn't know how to fight back. I wanted to fight back for my community but I did it the wrong way.*" (PSIR ¶ 39.) That statement carries a particular and painful resonance here: Mr. Vega's late mother—who died in 2015—was herself an undocumented immigrant who made her living as a street food vendor. (PSIR ¶ 80.) The immigration-enforcement actions that sparked the unrest struck a deeply personal, grief-laden nerve in a man already carrying untreated trauma. None of this makes the conduct acceptable. It does make it comprehensible, and it bears directly on Mr. Vega's culpability.

b.    *Mr. Vega's History and Characteristics — Compounded Grief and Serious, Untreated Mental Illness*

The most important fact about Mr. Vega's history is one the Probation Officer documents but does not weigh: he is a man living with serious, diagnosed, and completely untreated mental illness layered on top of catastrophic personal loss. Mr. Vega has been diagnosed with anxiety, depression, post-traumatic stress disorder, and substance use disorder. He attributes his PTSD to the deaths of his parents and his sister, and he "has never participated in mental health treatment nor has he learned healthy coping mechanisms." (PSIR ¶ 91.)

The losses behind that diagnosis are staggering. Mr. Vega's mother died in 2015 of pulmonary fibrosis; his father died in 2022. (PSIR ¶ 80.) His sister, Aide, who was born with Down syndrome and lived with him, died at the age of thirty-six of the same disease that took their mother; the two "*had a great relationship.*" (PSIR ¶ 81.) Mr. Vega absorbed each of these losses without any therapeutic support whatsoever.

The medical record confirms a man in active crisis. He was prescribed a battery of psychiatric medications—Quetiapine, Hydroxyzine, Fluoxetine, Buspirone, Gabapentin, and Trazodone—but in mid-May 2026 stopped taking most of them because he did not feel they were working, a decision that is itself a symptom of unmanaged, unsupported illness. (PSIR ¶¶ 93–94.) On May 29, 2026, he passed out at work and woke up in the hospital. (PSIR ¶ 92.)

The relevance of this history is well established. The Adverse Childhood Experiences ("ACE") research, developed by the Centers for Disease Control and Prevention, demonstrates a robust relationship between early and cumulative trauma and later substance use, mental-health conditions, and justice involvement. *Felitti, V.J., et al., Relationship of Childhood Abuse and Household Dysfunction to Many of the Leading Causes of Death in Adults: The Adverse Childhood Experiences (ACE) Study*, 14 Am. J. Preventive Med. 245 (1998). Mr. Vega was

11

DEFENDANT ISMAEL VEGA'S SENTENCING MEMORANDUM

raised in a neighborhood "plagued with gang violence," where he witnessed his seven-year-old nephew shot twice. (PSIR ¶ 82.) Courts routinely recognize a difficult background and untreated trauma as significant mitigating factors under § 3553(a). See *United States v. Munoz-Nava*, 524 F.3d 1137, 1149–50 (10th Cir. 2008).

### c.    *Mr. Vega's Chemically Dependent Adulthood*

Mr. Vega's substance use is inseparable from his trauma and his physical injuries. He has been a daily marijuana user for roughly twenty-five years. (PSIR ¶ 96.) He began using methamphetamine—the substance that has caused him the most harm—at age twenty-three, after a devastating bicycle-versus-automobile collision left him bedridden, requiring three pins in his knee and physical therapy to learn to walk again. (PSIR ¶¶ 88, 97.) The connection between untreated addiction and criminal conduct is widely recognized by the federal courts. See *United States v. Tomko*, 562 F.3d 558, 573 (3d Cir. 2009) (en banc). Critically, Mr. Vega has shown initiative: in February 2025—months before this case—he voluntarily began attending substance-abuse treatment classes twice weekly "because he wanted to make a positive change," and, as of the presentence interview, he was awaiting a bed in an inpatient program. (PSIR ¶ 99.) In the weeks since, however, Mr. Vega has faltered badly on supervision—declining a residential-treatment placement and missing drug tests, as addressed candidly below—a deterioration that is itself a symptom of the untreated illness and addiction described in this memorandum.

### d.    *The Supervision Relapse, Addressed Candidly*

The defense confronts head-on the most difficult fact before the Court: Mr. Vega has failed on pretrial release, and in ways that grew worse rather than better. Earlier in the case he relapsed on marijuana and methamphetamine and missed drug tests. (See ECF 262; PSIR ¶¶ 10–11.) More recently, as the July 10, 2026 violation report documents, he missed additional tests,

declined the residential-treatment bed that Pretrial Services worked to secure for him, and told the officer he "*does not care to report*." (ECF 326.) The Court has set an order-to-show-cause hearing on that conduct, and counsel neither excuses it nor asks the Court to pretend it did not happen. Context, however, matters: this is a man decompensating under the weight of serious, untreated mental illness. Mr. Vega carries diagnosed PTSD, depression, and anxiety that have never been treated; he recently stopped the psychiatric medications he had been prescribed; and he twice lost consciousness and was hospitalized. (PSIR ¶¶ 91–94.) A statement like "*I do not care*" is not so much the language of a defiant criminal as the language of hopelessness in a person whose depression and addiction are, on this record, spiraling without help—a clinical concern that points toward treatment, not toward years of undifferentiated incarceration. Indeed, Mr. Vega's failure in the community is itself the strongest evidence for the disposition the defense urges. Voluntary, community-based treatment has been tried and has not held; what Mr. Vega has never had is the structured, supervised, mandatory treatment that the Bureau of Prisons' RDAP program provides. A meaningful custodial term paired with RDAP and court-ordered mental-health treatment, followed by three years of supervised release on the same conditions, will do far more to reduce his risk and protect the public than the additional years of undifferentiated imprisonment the Government seeks. His recent noncompliance is a reason to mandate treatment—not a reason to abandon it.

### e.       *Mr. Vega's Sincere Remorse and Acceptance of Responsibility*

Section 3553(a)(1) directs the Court to consider whether a defendant genuinely confronts the harm he caused. Mr. Vega does. He admitted his conduct, agreed with the factual basis, and told the Probation Officer: *"I messed up. I made a wrong decision. ... I wanted to fight back for my community but I did it the wrong way. I am working on finding better ways to express my views. ... I am sorry."* (PSIR ¶ 39.) He pleaded guilty, accepted responsibility, and agreed to

make some form of restitution to the California Highway Patrol. Mr. Vega plans to allocate further as to his remorse at his sentencing later this month.

### f.     Mr. Vega's Family and Community Support

Mr. Vega is not without people who know him and stand behind him. He has been in a committed relationship with Carmen Gonzalez for five years and the two recently married; she posted the surety securing his release, continues to support him, and remains a stabilizing presence in his life. (PSIR ¶¶ 84–85; ECF 290.) He maintains positive relationships with his two brothers, Juan and Augustine, both of whom live and work locally. (PSIR ¶ 81.) Mr. Vega also has a now-adult daughter, Jenissa, from whom he was kept as a young man through no fault of his own and whom he hopes one day to know. (PSIR ¶ 83.)

### g.     Mr. Vega's Minimal and Remote Criminal History (§ 3553(a)(1), (a)(6))

Mr. Vega's criminal history is both minimal and remote. He is in Criminal History Category I with zero criminal history points. (PSIR ¶¶ 72–73.) Every prior conviction is between two and three decades old, sustained between the ages of eighteen and twenty-one (2003–2006). (PSIR ¶¶ 69–71.) He has not sustained a criminal conviction in nearly twenty years; the only intervening matter of record is a single pending 2018 misdemeanor petty-theft allegation. (PSIR ¶ 75.) A nearly two-decade gap in serious offending is powerful evidence that the instant offense was an aberration—a single night's catastrophic lapse by a man in crisis—rather than a forecast of future conduct. This history weighs strongly against any need for a lengthy sentence to protect the public.

### h.     Future Plans, Rehabilitation, and Treatment Needs (§ 3553(a)(2)(D))

Mr. Vega has concrete, realistic goals. He intends to obtain his GED and an associate's degree and hopes to pursue a career in respiratory therapy—but, tellingly, he "*wants to be sure that he can be consistently sober before embarking on the career*." (PSIR ¶ 102.) That ordering

of priorities reflects genuine self-awareness. The single most effective intervention available to Mr. Vega is the structured treatment that RDAP provides. RDAP is the Bureau of Prisons' most effective evidence-based substance-abuse program, and its completion can meaningfully reduce recidivism and carries the statutory benefit of potential early release for eligible non-violent offenders under 18 U.S.C. § 3621(e). The defense respectfully requests that the Court recommend RDAP placement and a mental-health evaluation and treatment in its judgment, and that Mr. Vega be designated to a facility in the Southern California region—he is a lifelong Angeleno whose partner and brothers all live locally—to permit the family contact that itself reduces recidivism.

i.    *The Need to Avoid Unwarranted Disparities (§ 3553(a)(6))*

A sentence of 18 months is significant for a Category I defendant, with no conviction in two decades, convicted of a single Class D felony carrying a five-year statutory maximum. It is sufficient to reflect the seriousness of the offense and to provide both general and specific deterrence, particularly when paired with three years of supervised release and intensive treatment conditions. It is also consistent with the relative culpability of the participants in this case: several co-defendants resolved their cases by pleading to a single-count Superseding Information, while Mr. Vega, like two others, pleaded to Count 7, and the Probation Officer assessed his role as neither aggravating nor mitigating. (PSIR ¶¶ 13–21, 56–57.) The requested sentence reflects that "medium" role and avoids the kind of unwarranted disparity § 3553(a)(6) is designed to prevent. The Government asks this Court to match the 40-month sentence it recommended for co-defendant Flores. (ECF 332 at 4.) But parity with Flores is a reason to sentence Mr. Vega below him, not equal to him: Flores came to the overpass carrying accelerant, poured two bottles of it onto a burning patrol car, threw a scooter onto the vehicles, and burned a

15
DEFENDANT ISMAEL VEGA'S SENTENCING MEMORANDUM

flag, whereas Mr. Vega acted with objects at hand and without that premeditation. Treating the two identically would itself produce the disparity § 3553(a)(6) forbids.

The Court should also weigh how other courts have sentenced defendants who engaged in materially similar conduct during periods of mass civil unrest. The most instructive comparison comes from the Eastern District of New York. In the George Floyd protests of late May 2020, two licensed New York attorneys, Urooj Rahman and Colinford Mattis, attacked a New York Police Department vehicle: Ms. Rahman threw a lit Molotov cocktail—a manufactured incendiary device—into the patrol car, and Mr. Mattis drove the van from which she acted. Like Mr. Vega, both were charged in a multi-count indictment that included the most serious available offenses (arson, use of explosives, and civil disorder); like Mr. Vega, both ultimately resolved their cases by pleading guilty to a single, reduced count—there, conspiracy to commit arson; and, like Mr. Vega, both faced a five-year statutory maximum.

Despite conduct involving an actual firebomb, United States District Judge Brian M. Cogan imposed sentences of **15 months** on Ms. Rahman and **12 months and one day** on Mr. Mattis—below even the Government's own request of eighteen months to two years for Ms. Rahman, and a fraction of the five-year maximum. *United States v. Mattis*, No. 1:20-cr-00203-BMC (E.D.N.Y.) (judgments entered Nov. 18, 2022 and Jan. 26, 2023). Both attorneys also lost their licenses to practice law. Those sentences, imposed on defendants who used a Molotov cocktail, frame the appropriate range here. Mr. Vega's requested 18-month sentence already exceeds both, fairly accounting for the aggravating fact that officers were nearby when he acted. A guideline sentence of 37 to 46 months, by contrast, would be roughly two-and-a-half to three times what these comparators received for protest-related conduct that was, in its use of a manufactured incendiary device, at least as dangerous as Mr. Vega's. That is precisely the kind

16
DEFENDANT ISMAEL VEGA'S SENTENCING MEMORANDUM

of unwarranted disparity "among defendants with similar records who have been found guilty of similar conduct" that § 3553(a)(6) directs this Court to avoid. The point is only sharpened by the fact that Mr. Vega's advisory range is inflated by an analogy to the arson guideline, U.S.S.G. § 2K1.4: the two defendants who actually committed an arson offense, with a real incendiary device, received far less than the Guidelines would mete out to Mr. Vega.

## VI.     CONCLUSION

For the foregoing reasons, Mr. Vega respectfully requests that the Court impose a sentence of 18 months' imprisonment, to be followed by a term of supervised release with appropriate treatment conditions. Mr. Vega further requests that the Court recommend his participation in RDAP, recommend a mental-health evaluation and treatment and to designate him to a facility in the Southern California region to be near his family..

DATED: July 13th, 2026                    Respectfully Submitted,

                                                    /s/

                                          JOHN TARGOWSKI
                                          Attorney for Defendant
                                          ISMAEL VEGA

DEFENDANT ISMAEL VEGA'S SENTENCING MEMORANDUM

**CERTIFICATE OF COMPLIANCE**

Pursuant to Local Rule 11-6.2, the undersigned certifies that this memorandum contains 4,246 words, excluding the caption, tables of contents and authorities, signature block, and this certification. In making this certification, counsel has relied on the word-count function of the word-processing software used to prepare the document.

DATED: July 13th 2026                           /s/ John Targowski

DEFENDANT ISMAEL VEGA'S SENTENCING MEMORANDUM